16-336-cv
Callahan v. Cty. of Suffolk

# In the
# United States Court of Appeals
## For the Second Circuit

August Term, 2016
No. 16-336-cv

CHRISTOPHER CALLAHAN, INDIVIDUALLY AND AS ADMINISTRATOR
D.B.N. OF THE ESTATE OF KEVIN CALLAHAN, PATRICIA CALLAHAN,
INDIVIDUALLY,
*Plaintiffs-Appellants*,

*v.*

POLICE OFFICER THOMAS WILSON, #5675, SERGEANT SCOTT GREENE,
#960,
*Defendants-Appellees*,

THE COUNTY OF SUFFOLK, DETECTIVE RIVERA, DETECTIVE O'HARA,
JOHN DOE, SUFFOLK COUNTY POLICE OFFICERS #1-10, RICHARD ROE,
SUFFOLK COUNTY EMPLOYEES #1-10, POLICE OFFICER ROBERT KIRWAN,
#2815, POLICE OFFICER JAMES BOWEN, #1294, DETECTIVE SERGEANT
THOMAS M. GRONEMAN, DETECTIVE LIEUTENANT GERARD PELKOFSKY,
*Defendants.*[*]

---

[*] The Clerk of Court is directed to amend the caption as set forth above.

Appeal from the United States District Court
for the Eastern District of New York.
No. 12-cv-2973 — Leonard D. Wexler, *Judge*.

---

ARGUED: FEBRUARY 8, 2017
DECIDED: JULY 12, 2017

---

Before: PARKER, RAGGI, and DRONEY, *Circuit Judges*.

---

Appeal from a judgment of the United States District Court for the Eastern District of New York (Wexler, *J.*) entered following a jury verdict finding defendant police officer Thomas Wilson did not use excessive force, under 42 U.S.C. § 1983 and the Fourth Amendment, in fatally shooting Kevin Callahan. We conclude that the jury instruction regarding the legal justification for the use of deadly force by a police officer did not comply with our prior decision in *Rasanen v. Doe*, 723 F.3d 325 (2d Cir. 2013). Accordingly, we **VACATE** the judgment of the district court and **REMAND** for a new trial.

Judge RAGGI concurs in part and dissents in part in a separate opinion.

---

DONNA ALDEA (Alexander R. Klein, *on the brief*), Barket Marion Epstein & Kearon, LLP, Garden City, NY, *for Plaintiffs-Appellants*.

2

BRIAN C. MITCHELL, Assistant County Attorney, *for* Dennis M. Brown, Suffolk County Attorney, Hauppauge, NY, *for Defendants-Appellees.*

DRONEY, *Circuit Judge*:

On September 20, 2011, Kevin Callahan ("Callahan") was shot and killed during a confrontation with Thomas Wilson, a police officer employed by Suffolk County, New York. Christopher and Patricia Callahan—the decedent's brother and mother—filed this suit pursuant to 42 U.S.C. § 1983 against Wilson, other Suffolk County police officers and employees, and Suffolk County, alleging, among other causes of action, that Officer Wilson's use of deadly force violated the Fourth Amendment prohibition against excessive force. The case proceeded to trial. Following the completion of evidence, the district court declined to give plaintiffs' proposed jury instruction regarding the use of deadly force by a police officer that tracked the deadly force instruction we endorsed in *Rasanen v. Doe*,

3

723 F.3d 325 (2d Cir. 2013). The jury returned a verdict in favor of Officer Wilson.

We agree with plaintiffs that the district court's jury charge concerning deadly force was inconsistent with *Rasanen*, and this error was not harmless. Accordingly, we **VACATE** the judgment of the district court and **REMAND** for a new trial.

**BACKGROUND**

**I.      Fatal Shooting of Kevin Callahan**

In the early afternoon of September 20, 2011, Suffolk County Police Officer Thomas Wilson responded to a radio call from a dispatcher reporting a situation involving a gun at the single-family home of Patricia Callahan in Selden, New York. The radio transmission indicated that Patricia Callahan—who was not at her home—had been on the phone with her son, Kevin Callahan,[1] who

---

[1] At the time, Kevin Callahan was twenty-six years old.

was at the home in Selden and had told his mother that another person with him had a gun.

When Officer Wilson arrived at the Callahan home, two other Suffolk County officers, Dan Furey and Elisa McVeigh, had already arrived in response to the dispatch. Officers Wilson, Furey, and McVeigh approached the front entrance to the home, where the screen door was closed but the front door was open. The officers knocked on the screen door, announced their presence, and entered to investigate; McVeigh searched the upstairs while Furey and Wilson went downstairs. Officer Wilson repeatedly announced the officers' presence and asked if anybody was in the home or needed help. The officers did not hear any response.

Once they reached the bottom of the stairs, Officers Wilson and Furey split up—Wilson went to the left, and Furey went to the right. Officer Wilson testified that he saw a cleaver knife in the den area downstairs, which heightened his concern. Wilson checked one

5

bedroom downstairs and then turned to another bedroom to his right. The door was partially open, and as Officer Wilson began to walk through it, he saw an individual through the partially opened door and called out, "police, I see you, . . . don't move." J.A. 270. According to Wilson, the person in the room "start[ed] to square off towards the door" and then forcefully attempted to close the bedroom door on Wilson. J.A. 271.

Officer Wilson testified that he had been holding his semi-automatic service pistol in his left hand down by his left leg, and when the door partially closed on him, he was pinned in the doorframe such that his hand holding the gun was on the other side of the door. Wilson testified that he then saw "some type of object" on the other side of the door, but his flashlight had been knocked out of his right hand and he had only a limited view, so he did not know what the object was. J.A. 275. He testified that the person on the other side of the door also made a sound like "some type of

6

growl" that was "scar[]y." J.A. 275. According to Wilson, he feared that he could be shot through the door or that his gun might be used against him, so he tried to free himself. He testified that, while he was trying to pull himself out of the door, he saw "a shadow coming around the door" and "a hand thrusting towards [him] with an object." J.A. 309. Still unable to get out of the doorway, Officer Wilson fired his weapon while the gun was on the other side of the door. Wilson testified that after the initial gunshots, the door let up, which caused him to fall back. As he fell, he continued to fire, but now through the door.

According to Wilson, he then stood up and ran toward Officer Furey, took cover, and reported over the radio: "shots fired, man behind the door, unknown weapon or object." J.A. 311–12. Emergency services arrived with more police officers. Officers entered the downstairs bedroom and saw a person later identified as Kevin Callahan behind the bedroom door, sitting on his heels with

7

his hands under his chest and his chest on his thighs. The officers asked to see his hands and did not receive a response, at which point they placed him in handcuffs and called medical services for him. Callahan died from his gunshot wounds.

Forensic analysis and an autopsy later established that Officer Wilson fired a total of four shots, three of which struck Callahan. Two shots were fired from inside the bedroom, and the other two shots were fired through the door. The first shot fired inside the bedroom resulted in a contact wound to Callahan's back, and the second shot from inside the bedroom entered Callahan's back right shoulder and exited from his right abdomen. The shot fired through the door that hit Callahan caused a wound in his front upper abdomen/chest area. No weapon was found in the bedroom where Callahan was located.

**II.    Plaintiffs' Excessive Force Claim**

In 2012, Christopher and Patricia Callahan filed suit in the United States District Court for the Eastern District of New York against Suffolk County, Officer Wilson, and other Suffolk County police officers and employees. The complaint asserted several state and federal claims in connection with Kevin Callahan's death, including excessive force pursuant to 42 U.S.C. § 1983 and the Fourth Amendment to the U.S. Constitution.[2]

---

[2] Kevin Callahan's claim under Section 1983 survived his death for the benefit of his estate, and is brought by his brother, Christopher, the administrator of his estate. *See Barrett v. United States*, 689 F.2d 324, 331 (2d Cir. 1982). Christopher Callahan and Patricia Callahan were named as plaintiffs for additional claims not relevant to this appeal.

The excessive force claim proceeded to trial in July 2015.[3]  The jury returned a verdict in favor of Officer Wilson.[4]  Plaintiffs moved for judgment as a matter of law or a new trial pursuant to Federal Rules of Civil Procedure 50 and 59, which the district court denied. Judgment entered on January 29, 2016,[5] and this appeal followed.

---

[3] The trial also included an Eighth Amendment claim against Suffolk County Police Sergeant Scott Greene for deliberate indifference to the medical needs of Kevin Callahan after the shooting.  The district court bifurcated the trial of plaintiffs' claims, such that the excessive force and deliberate indifference claims were tried together in the first phase, after which a second trial would address *Monell* liability of Suffolk County and other related claims if necessary.  The first trial also originally included false arrest claims, but plaintiffs voluntarily dismissed those claims after their case-in-chief.

[4] The jury also returned a defense verdict on the deliberate indifference claim against Sergeant Greene, which plaintiffs have not challenged here.  Defendants raised a qualified immunity defense as to both the excessive force and deliberate indifference claims as part of their oral Rule 50 motion, which the district court denied in its entirety.  Qualified immunity was not otherwise litigated at trial, and defendants have not raised it on appeal.

[5] Although the jury's verdict addressed plaintiffs' claims against only Wilson and Greene, it appears that the district court entered judgment in favor of all defendants.  The record is not entirely clear, but it appears the district court concluded that the defense verdict in the first phase of the bifurcated trial necessarily defeated plaintiffs' remaining claims.

**DISCUSSION**

On appeal, plaintiffs argue that a new trial is necessary because the jury was not properly instructed regarding the legal standards that govern the use of deadly force under these circumstances. We review jury instructions *de novo*, considering the challenged instruction in light of the charge as a whole. *Warren v. Pataki*, 823 F.3d 125, 137 (2d Cir. 2016). A jury instruction is erroneous if it "misleads the jury as to the correct legal standard or does not adequately inform the jury on the law." *Velez v. City of N.Y.*, 730 F.3d 128, 134 (2d Cir. 2013) (internal quotation marks omitted). An erroneous jury instruction requires a new trial unless the error is harmless. *Id.* We conclude that the use of force instructions here were inconsistent with our prior decision in *Rasanen v. Doe*, 723 F.3d 325 (2d Cir. 2013), and we cannot say that the error was harmless.

**I.    Instructional Error**

In *Rasanen v. Doe*, decided approximately two years before the trial here, we explained that the jury charge in a Section 1983 police shooting case alleging excessive use of force by a police officer in circumstances similar to those here must include a specific instruction regarding the legal justification for the use of deadly force. 723 F.3d at 333, 337. The instruction "must" convey "that the use of force highly likely to have deadly effects is unreasonable unless the officer had probable cause to believe that the suspect posed a significant threat of death or serious physical injury to the officer or to others." *Id.* at 334. Failure to so instruct the jury constitutes plain error, as it "deprives the jury of adequate legal guidance to reach a rational decision on [the] case's fundamental issue." *Id.* at 334–35 (alteration and internal quotation marks omitted).

Defendants-Appellees suggest that *Rasanen* may no longer control in light of the Supreme Court's decision in *Plumhoff v. Rickard*, 134 S. Ct. 2012 (2014). In *Plumhoff*, a dangerous police car chase of a fleeing suspect ended when police officers fired at the vehicle, killing the driver and a passenger. *See id.* at 2017–18. The Supreme Court concluded that the officers did not violate the Fourth Amendment's prohibition against the use of excessive force. *See id.* at 2020–22. *Plumhoff* did not, however, involve any claim of instructional error, nor does the opinion alter the authorities on which *Rasanen* relied regarding the appropriate jury charge concerning the fatal shooting of suspects in the circumstances presented here. In particular, *Plumhoff* involved an application of *Scott v. Harris*, 550 U.S. 372 (2007), which was decided several years before *Plumhoff* and was discussed at length in *Rasanen*, *see* 723 F.3d at 333–34.

Nor does the Supreme Court's recent decision in *County of Los Angeles v. Mendez*, 137 S. Ct. 1539 (2017), undermine *Rasanen*'s holding as to the requirements for a jury charge in the type of excessive force case presented here. In *Mendez*, the Supreme Court rejected the Ninth Circuit's "provocation rule" because that rule allowed a prior independent Fourth Amendment violation "to manufacture an excessive force claim where one would not otherwise exist." *Id.* at 1546. In explaining its decision, the Court noted that "[t]he operative question in excessive force cases is 'whether the totality of the circumstances justifie[s] a particular sort of search or seizure.'" *Id.* (quoting *Tennessee v. Garner*, 471 U.S. 1, 8–9 (1985)). Importantly, *Garner* articulated the probable cause requirement for police shooting cases upon which this Court relied in *Rasanen*. *See Rasanen*, 723 F.3d at 333 ("In *Garner*, the Supreme Court explained that '[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm,

14

either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force.'" (quoting *Garner*, 471 U.S. at 11)).

Thus, as relevant here, we conclude that neither *Plumhoff* nor *Mendez* overrules *Rasanen*, which remains the controlling law of this Circuit. Defendants do not attempt to distinguish *Rasanen* on the facts, which is unsurprising given the similarity between the circumstances of the shooting in that case and the underlying facts here. Accordingly, we are bound to follow *Rasanen* in this case.[6] *See Shipping Corp. of India v. Jaldhi Overseas Pte Ltd.*, 585 F.3d 58, 67 (2d Cir. 2009) ("[A] panel of our Court is bound by the decisions of prior panels until such time as they are overruled either by an *en banc* panel of our Court or by the Supreme Court." (internal quotation marks omitted)).

---

[6] We acknowledge that, when faced with the question we previously addressed in *Rasanen*, other Circuits have reached different, and sometimes opposite, conclusions. *See Johnson v. City of Phila.*, 837 F.3d 343, 349 (3d Cir. 2016); *Noel v. Artson*, 641 F.3d 580, 587 (4th Cir. 2011); *Penley v. Eslinger*, 605 F.3d 843, 850 (11th Cir. 2010); *Acosta v. Hill*, 504 F.3d 1323, 1324 (9th Cir. 2007).

Applying *Rasanen*, we conclude that the jury charge regarding deadly force was erroneous. Plaintiffs' proposed jury instructions included the specific language we endorsed in *Rasanen* and cited that decision. At the charge conference, plaintiffs' counsel also orally requested that the jury charge include that language, arguing that "it's not just a matter of semantics."[7] J.A. 566. The district court denied plaintiffs' request, and instead instructed the jury in accordance with the general excessive force instructions that apply in situations involving non-deadly force,[8] with two modifications: the charge specifically referred to "deadly force" in two places, and it included language about an officer's probable cause to believe that he or she faces a threat of death or serious injury. The exact language of the district court's charge was as follows:

---

[7] Unlike *Rasanen*, which considered the excessive force charge under plain-error review because no clear objection was made to that portion of the charge, *see* 723 F.3d at 333, plaintiffs here clearly preserved their objection. *See* J.A. 565–67.

[8] *See, e.g.*, *Terranova v. New York*, 676 F.3d 305, 307, 309 (2d Cir. 2012); *United States v. Schatzle*, 901 F.2d 252, 254–55 (2d Cir. 1990).

A person has the right, under the United States Constitution, to be free from the use of excessive force.

A police officer is entitled to use reasonable force. A police officer is not entitled to use any force beyond what is necessary to accomplish a lawful purpose. Reasonable force may include the use of deadly force.

A police officer may use deadly force against a person if a police officer has probable cause to believe that the person poses a significant threat of death or serious physical injury to the officer or others.

In determining whether the police officer used reasonable force, the actions of the police officer are measured by the test of what a reasonable and prudent police officer would have done under the same circumstances confronting the police officer without regard to the police officer's underlying subjective intent or motivation.

That means the evil intentions will not be considered excessive force if the force used was in fact reasonable.

On the other hand, an officer's good intentions will not make the use of excessive force constitutional. The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene rather than with hindsight.

The nature of reasonableness must allow for the fact that police officers are often forced to make split-second

> judgments under circumstances that are tense, uncertain and rapidly evolving about the amount of force that is necessary in a particular situation.
>
> This reasonableness inquiry is an objective one. The question is whether the defendant police officer's actions w[ere] objectively reasonable in light of the facts and circumstances confronting the police officer.
>
> In determining whether the police officer used excessive force, you may consider, one, the need for the application of force; two, the relationship between the need and the amount of force used; three, the threat reasonably perceived by the police officer; and, four, any efforts made to temper the severity of a forceful response.

J.A. 605–06.

Unlike in *Rasanen*, the charge here did refer to the probable cause necessary for an officer to reasonably use deadly force. But the instruction did not track the language from *Rasanen*, and we conclude that it is materially different from the language we approved there, even with the reference to "probable cause." In *Rasanen*, we held that the jury "must" be instructed that the use of deadly force is "*unreasonable unless* the officer had probable cause to

18

believe that the suspect posed a significant threat of death or serious physical injury to the officer or to others," 723 F.3d at 334 (emphasis added); here, the jury was instructed that an officer "*may* use deadly force . . . *if*" the officer has the requisite probable cause, J.A. 605 (emphases added).

Although these two formulations both refer to the probable cause requirement for the use of deadly force, they are not functionally equivalent. In *Rasanen*, we explicitly distinguished between the permissive "may/if" language and the restrictive "unless/only" language by reference to the New York State Police administrative manual before the jury in that case. *See Rasanen*, 723 F.3d at 335–37. The relevant provision in that manual used nearly identical language to the charge here, stating: "A[n officer] may use deadly physical force against another person when they reasonably believe it to be necessary to defend the [officer] or another person from the use or imminent use of deadly physical force." *Id.* at 336

19

(internal quotation marks omitted). In concluding that this formulation did not correctly instruct the jury, we explained that the problem with the "may/if" language is that it "is not framed in exclusive and restrictive terms." *Id.* at 337. That formulation was insufficient because it did not convey that an officer's use of deadly physical force is reasonable, and therefore legally permissible, only in a specific circumstance.[9] *Id.*

Thus, the charge given to the jury here—which used the same permissive "may/if" language that we specifically rejected in *Rasanen*—was deficient. This error in the formulation of the specific deadly force instruction was compounded by the balance of the charge regarding excessive force, which further weakened the

---

[9] The dissent understates the prominence of this manual provision in *Rasanen* by characterizing it as one piece of evidence among many in the trial record. *See* Dissenting Op., *post* at 5–6. To the contrary, *Rasanen* explained that the deadly force provision played a more important role at the trial in that case: the district court instructed the jury that certain manual provisions, including the deadly force provision, "apply to the case," and the jury indicated that it was specifically considering that provision during its deliberations. 723 F.3d at 336–37 (internal quotation marks omitted).

probable cause requirement. For example, the jury was also told that an officer "is entitled to use reasonable force," which "may include the use of deadly force." J.A. 605. Later in the charge, the district court again instructed the jury according to language that applies to non-deadly uses of force.

These instructions were further "dilute[d]," *Rasanen*, 723 F.3d at 335, by suggesting that the jury could find that Officer Wilson's shooting of Callahan complied with constitutional standards for reasons other than the fact that Wilson had probable cause to believe that Callahan posed a significant threat of death or serious injury to Wilson or others. Similar to *Rasanen*, the entirety of the charge here allowed the jury to conclude that "the shooting seemed necessary" because Wilson "acted reasonably under the circumstances," even if the jury concluded that Callahan did not pose that type of threat. *Id.* at 336 (emphasis omitted). *Rasanen* makes clear, however, that an officer's use of deadly force in a police shooting case is not, as a

21

matter of law, reasonable *unless* that officer had probable cause to believe that the individual posed a significant threat of death or serious physical injury to the officer or others. *Id.* at 334. Thus, the charge here suffers from the same "fatal defect" as the charge in *Rasanen*—"the jury did not know, because it was not told," that it could not properly conclude that the shooting was justified unless it found that the probable cause requirement was met. *Id.* at 336.

Even though the jury was told that Officer Wilson would have been permitted to use deadly force *if* he had probable cause to believe that Callahan posed a significant threat of death or serious injury, our required charge is more demanding; under *Rasanen*, such probable cause is the *only* situation in which Wilson was permitted to use deadly force, and the jury must be so instructed.

## II. Harmlessness Analysis

An erroneous jury instruction requires a new trial unless the error was harmless. *Uzoukwu v. City of N.Y.*, 805 F.3d 409, 418 (2d

22

Cir. 2015). "An error is harmless only if the court is convinced that the error did not influence the jury's verdict." *Id.* (internal quotation marks omitted). We are not persuaded that the error in the deadly force charge given here was harmless.

The focus of the trial was how the events unfolded in the Callahan basement that afternoon. As discussed above, under the instructions the jury was given, the jury could have reached its verdict without concluding that Officer Wilson had probable cause to believe that Callahan posed a threat of death or serious injury. That conclusion is compelled by the fact that the instructions here allowed the jury to return a defense verdict if it found that Wilson acted according to an overly general standard of "reasonableness" that does not comport with the holding of *Rasanen*—that deadly force in this context is reasonable only if the requisite probable cause standard is satisfied. On this record, we cannot determine whether the jury answered the critical question and concluded that probable

23

cause existed, or instead decided the case according to a more general standard that is inconsistent with our Circuit's precedent in this particular type of case. Because this error allowed the jury to decide the case on different grounds than *Rasanen* permits, we are not convinced that the error did not influence the jury's verdict, and we therefore cannot say that it was harmless.[10]

---

[10] That the parties referred to probable cause during their summations does not, as the dissent suggests, render the error here harmless. *See* Dissenting Op., *post* at 7–9. The parties' various arguments did not cure the instructional error described above, especially in light of the court's instructions that the jury was required to follow the law as articulated by the court, not the lawyers.

**III.    Evidentiary Rulings**

Because we have concluded that plaintiffs are entitled to a new trial on the basis of instructional error, we need not consider their remaining arguments. Nevertheless, we briefly address the evidentiary issues raised on appeal in order to provide some guidance in connection with the retrial in this case, as the issues appear likely to recur. *See Rentas v. Ruffin*, 816 F.3d 214, 223 (2d Cir. 2016).

Plaintiffs contend that the district court erred by excluding two pieces of evidence at trial: (1) expert testimony about police protocol, and (2) prior incidents in which Officer Wilson fired his weapon. We review a district court's evidentiary rulings, including those as to expert testimony, for abuse of discretion. *Lore v. City of Syracuse*, 670 F.3d 127, 155 (2d Cir. 2012). A district court abuses its discretion if it makes "an error of law or a clear error of fact." *Abascal v. Fleckenstein*, 820 F.3d 561, 564 (2d Cir. 2016) (internal

25

quotation marks omitted). Upon review of the trial record, we identify no such error in the district court's decisions.

At trial, plaintiffs attempted to introduce expert testimony by former New York City police officer Joseph Zogbi regarding police training and protocol. As explained in his report, Zogbi concluded that Officers Wilson and Furey did not act in accordance with standard police room clearing techniques when they arrived at the Callahan residence, and that the officers had not been properly trained with respect to "basic tactical movement and mindset." J.A. 156. The district court precluded Zogbi from testifying as to plaintiffs' excessive force claim.[11]

We conclude that this decision was not an abuse of discretion. As we have explained, a district court has "broad discretion" to carry out its "gatekeeping function" with respect to expert

---

[11] Because the trial was bifurcated, the district court ruled that Zogbi would be permitted to testify in the second phase of the proceedings as to plaintiffs' municipal liability claims.

26

testimony, which involves ensuring that the proffered testimony "is relevant to the task at hand." *In re Pfizer Inc. Sec. Litig.*, 819 F.3d 642, 658 (2d Cir. 2016) (internal quotation marks omitted). Here, Zogbi's expert report focused on whether Officer Wilson's training was adequate and what a properly trained officer would or would not have done in a similar situation. Contrary to plaintiffs' arguments, the district court acted within its discretion in concluding that these opinions are not relevant to Wilson's liability on the excessive force claim, as the type of training that Wilson received does not shed light on the dispositive question here—whether Wilson had probable cause to believe that Callahan posed a significant threat to his safety. Nor are Zogbi's opinions about police training relevant to Wilson's credibility in recounting what happened in the Callahan basement that afternoon.

Moreover, expert testimony is not admissible under Federal Rule of Evidence 702 if it "usurp[s] . . . the role of the jury in

27

applying th[e] law to the facts before it," as such testimony "undertakes to tell the jury what result to reach, and thus attempts to substitute the expert's judgment for the jury's." *Nimely v. City of N.Y.*, 414 F.3d 381, 397 (2d Cir. 2005) (first alteration in original) (internal quotation marks omitted). In this case, Zogbi's suggestions that Officer Wilson did not act reasonably under the circumstances intrude on the jury's exclusive role as the finder of facts. The district court therefore acted within its discretion in precluding Zogbi from testifying with respect to plaintiffs' excessive force claim against Officer Wilson.

Regarding Officer Wilson's prior discharges of his weapon, plaintiffs sought to introduce evidence that Wilson had twice fired his pistol at dogs that he perceived to be threatening him while he was on duty. The district court ruled that the evidence was not admissible, and we conclude that this decision was also within the court's discretion.

Plaintiffs point to this Court's "inclusionary approach" to evidence of prior bad acts under Federal Rule of Evidence 404(b), *United States v. Lombardozzi*, 491 F.3d 61, 78 (2d Cir. 2007), and argue that the evidence should have been admitted to show Officer Wilson's mental state when he fired at Callahan and to discredit Wilson's testimony that he perceived the situation to be dangerous. Even if this evidence was offered for a proper non-propensity purpose—an issue that we need not and do not reach—the district court was nevertheless entitled to conclude that the prejudicial effect of the evidence substantially outweighed its limited probative value. *See United States v. Scott*, 677 F.3d 72, 79, 83–85 (2d Cir. 2012). It was therefore not an abuse of discretion for the court to conclude that the evidence was inadmissible.

In sum, on the record of this trial, the district court acted within its discretion in excluding Zogbi's expert testimony and the evidence concerning Officer Wilson's prior weapons discharges.

Although we conclude that there was no abuse of discretion here, we note that any retrial may present different circumstances that lead to different conclusions.

**CONCLUSION**

The instructions given to the jury in this case regarding the lawfulness of Officer Wilson's use of force against Kevin Callahan misstated the law of our Circuit as articulated in *Rasanen*, 723 F.3d at 333–38, and we cannot say that this error was harmless. We therefore **VACATE** the judgment of the district court and **REMAND** for a new trial.

REENA RAGGI, *Circuit Judge*, concurring in part and dissenting in part:

I concur in so much of the panel decision as concludes that the district court acted within its discretion in excluding testimony regarding police protocols and prior instances in which Officer Wilson fired his weapon. *See* Majority Op., *ante* at 25–30. I respectfully dissent, however, from that part of the decision identifying reversible charging error in reliance on *Rasanen v. Doe*, 723 F.3d 325 (2d Cir. 2013). *See* Majority Op., *ante* at 11–24.

At the outset, I recognize that this panel is bound by *Rasanen*'s holding that in a civil action against a police officer for the unconstitutional use of deadly force, a district court cannot charge a jury that the standard for assessing the officer's use of such force is simply "reasonableness." Rather, the court must charge that the constitutional use of deadly force requires the officer to have had probable cause to believe that the person killed posed a significant threat of death or serious injury to the officer or to others. *See Rasanen v. Doe*, 723 F.3d at 334, 337; *see generally Harper v. Ercole*, 648 F.3d 132, 140 (2d Cir. 2011) (stating that panel is bound by prior decisions of court unless reversed *en banc* or by Supreme Court). I, therefore, do not repeat here my reasons for dissenting in *Rasanen*. *See Rasanen v. Doe*, 723 F.3d at 338–46 (Raggi, J., dissenting).

I note only that *Rasanen* continues to set this court apart from our sister circuits, which construe the Supreme Court's decision in *Scott v. Harris*, 550 U.S. 372 (2007), to "abrogate" the use of any special standards for deciding when the use of deadly force is constitutionally excessive and to "reinstate[] 'reasonableness' as the ultimate—and only—inquiry."[1] *Johnson v. City of Philadelphia*, 837 F.3d 343, 349 (3d Cir. 2016); *see Acosta v. Hill*, 504 F.3d 1323, 1324 (9th Cir. 2007) ("*Scott* held that there is no special Fourth Amendment standard for unconstitutional deadly force. Instead, all that matters is whether [police] actions were *reasonable*." (emphasis in original) (internal quotation marks omitted)); *see also Noel v. Artson*, 641 F.3d 580, 587 (4th Cir. 2011) (rejecting argument for special charge on use of deadly force where district court "submitted the case to the jury under the general rubric of reasonableness" because "*all* claims that law enforcement officers have used excessive force . . . should be analyzed under the Fourth Amendment and its 'reasonableness'

---

[1] In *Scott v. Harris*, 550 U.S. 372 (2007), the Supreme Court clarified that *Tennessee v. Garner*, 471 U.S. 1, 11 (1985) (holding that where officer "has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force"), "did not establish a magical on/off switch that triggers rigid preconditions whenever an officer's actions constitute 'deadly force[]'"; rather, "*Garner* was simply an application of the Fourth Amendment's 'reasonableness' test," *Scott v. Harris*, 550 U.S. at 382.

standard" (emphasis in original)); *Penley v. Eslinger*, 605 F.3d 843, 849–50 (11th Cir. 2010) (holding that "Fourth Amendment's 'objective reasonableness' standard supplies the test to determine whether the use of force was excessive").

Moreover, since *Rasanen*, the Supreme Court has reiterated that the "settled and *exclusive* framework" for analyzing claims of excessive force is "reasonableness." *County of Los Angeles v. Mendez*, 137 S. Ct. 1539, 1546 (2017) (emphasis added) (rejecting Ninth Circuit rule that otherwise reasonable defensive use of force is unreasonable as a matter of law where officers provoked violence to which they then responded with deadly force); *see Plumhoff v. Rickard*, 134 S. Ct. 2012, 2020 (2014) ("A claim that law-enforcement officers used excessive [deadly] force to effect a seizure is governed by the Fourth Amendment's 'reasonableness' standard."). Insofar as neither *Mendez* nor *Plumhoff* spoke to the issue of how juries should be charged in excessive force cases, the majority concludes that they do not overrule *Rasanen*. *See* Majority Op., *ante* at 15. But neither did *Tennessee v. Garner*, 471 U.S. 1 (1985), or *O'Bert ex rel. O'Bert v. Vargo*, 331 F.3d 29 (2d Cir. 2003)—the cases on which *Rasanen* relied to identify a probable-cause charging requirement—speak to jury charges. Indeed, *Garner* arose in the context of a bench trial, and the issue in *O'Bert* was

3

the denial of summary judgment to a defendant who invoked qualified immunity to avoid trial. *See Rasanen v. Doe*, 723 F.3d at 340 (Raggi, J., dissenting).

I do not pursue the matter further, however, because even following *Rasanen*'s holding, as this panel must, I would not identify charging error in this case. The jury instructions on the reasonable use of deadly force in *Rasanen* failed to make *any* mention of a need for probable cause to believe that the suspect posed a significant threat of death or serious physical injury. *See id.* at 330–31 (majority opinion). By contrast, the district court here cited such probable cause as the *only* example of when an officer might permissibly use deadly force:

> A police officer is entitled to use reasonable force. A police officer is not entitled to use any force beyond what is necessary to accomplish a lawful purpose. Reasonable force may include the use of deadly force.

> A police officer *may use deadly force against a person if a police officer has probable cause to believe that the person poses a significant threat of death or serious physical injury to the officer or others.*

App'x 605 (emphasis added). The majority nevertheless concludes that this charge is constitutionally inadequate because the jury could have construed "may," in the italicized text, as merely illustrative and, therefore, thought that deadly force might also be "reasonable" in other circumstances where the cited probable cause was lacking. *See* Majority Op., *ante* at 18–22. I cannot agree.

4

The context in which the probable cause instruction was given indicates that the word "may" was used to convey legal authorization rather than mere illustration. *See, e.g.*, Black's Law Dictionary 1068 (9th ed. 2009) (defining "may" as "[t]o be permitted to"); Webster's Third New International Dictionary (Unabridged) 1396 (1986 ed.) (defining "may" as to "have power," or "be able" and to "have permission to"). Thus, when the two quoted paragraphs were heard together, a reasonable jury would understand that (1) it can sometimes be "reasonable" for an officer to use deadly force, and (2) when such force may be used, *i.e.*, when it is constitutionally authorized, is when the officer has "probable cause to believe that the person poses a significant threat of death or serious physical injury." App'x 605. This was sufficient to avoid the prejudicial error identified in *Rasanen*, *i.e.*, the district court's failure in that case "to instruct the jury with regard to the justifications for the use of deadly force articulated in *O'Bert* and *Garner*." *Rasanen v. Doe*, 723 F.3d at 334.

Nor do I think a different conclusion is compelled by *Rasanen's* determination that the instruction's omission in that case was not rectified by inclusion in the record of a police manual provision advising officers that they "may use deadly physical force against another person when they reasonably

5

believe it to be necessary to defend" themselves or others "from the use or imminent use of deadly physical force."  *Id.* at 336 (quoting N.Y. State Police Admin. Manual § 16B1(A)); *see id.* at 337 (observing that manual's language was not framed in "exclusive and restrictive terms").  As *Rasanen* itself concluded, a jury's opportunity to consider a manual provision that is in evidence is not the same as receiving an instruction from the court.  *See id.* at 337 (noting that manual provisions were of little relevance in any event, as they could "not substitute for an instruction" to the jury).[2]

More to the point, whatever a jury could have inferred from these manual provisions in *Rasanen*, where the district court provided no instructions as to the probable cause required to use deadly force, a similar concern is not warranted

---

[2] The majority states that the district court in *Rasanen* told the jury "that certain manual provisions, including the deadly force provision, 'apply to the case.'" Majority Op., *ante* at 20 n.9 (quoting *Rasanen v. Doe*, 723 F.3d at 336).  I respectfully submit that the circumstances are more complex than our decision in *Rasanen* reports.  While the deliberating *Rasanen* jury sent the district court a note referencing manual provision § 16B1(A) (Self Defense or Defense of Others) in evidence, what it asked was whether "certain other provisions" of the manual applied, *id.* at 336, specifically, "[§16B1](C), (E), (F), [and] (H)," App'x 1490, *Rasanen v. Doe*, 723 F.3d 325 (No. 12-680-cv).  With no further mention of § 16B1(A), the district court told the jury that § 16B1(C) (Prevention of Termination of Felonies) did not apply to the case, but that subdivisions (E), (F), and (H), which related to the feasibility of using warnings or alternatives to deadly force and an officer's responsibility for the use of force, did apply.  *See id.* at 1501–04; *see also Rasanen v. Doe*, 723 F.3d at 336–37.

here.  Not only did the district court follow its general reasonableness charge with the specific instruction that an officer may use deadly force when he has the probable cause to believe that a person poses a significant threat of death or serious physical injury to him or others, but also, that was the only justification for the use of deadly force that was identified for the jury.  The district court's charge did not suggest, and the parties did not argue, the existence of any other circumstances in which deadly force might reasonably be used.

Indeed, even if there was charging error in the district court's failure to employ "only if" language respecting such probable cause, I would think that error harmless beyond a reasonable doubt in this case because the parties' singular focus at trial and on summation was the presence or absence of probable cause for Officer Wilson to believe that the deceased Callahan posed a significant threat to the officer's life at the time he used deadly force.

Plaintiffs' counsel told the jury that he did not even dispute that Officer Wilson held a "subjective" fear for his life when he discharged his firearm, thereby killing Callahan.  App'x 573.  Counsel argued only that the circumstances failed—"objectively"—to demonstrate probable cause for that fear.  *Id.*; *see Dancy v. McGinley*, 843 F.3d 93, 116 (2d Cir. 2016) (observing that

7

"Supreme Court [has] made clear" that standard for assessing propriety of officer's use of force is "objective reasonableness"). Repeatedly, plaintiffs' counsel emphasized that Wilson could not lawfully "use deadly physical force, firing a gun, unless there's probable cause to believe that his life is at risk, somebody else is going to use deadly force against him, or that somebody is going to cause serious physical injury to him or somebody else." App'x 576; *see id.* at 580 ("The law says . . . you're to rule for the plaintiff, . . . unless there's probable cause, reasonably, objectively, probable cause to believe that [the officer's] life was in danger or that someone else was in danger, and that's clearly not the case here, clearly not the case.").

The defense, in its summation, neither objected to these statements of the applicable legal standard nor argued otherwise. To the contrary, defense counsel embraced the probable cause standard, telling the jury that his summation would "discuss with you how the evidence has shown that on that day in September 2011, Tom Wilson had probable cause to believe that he was facing a significant threat of death or serious injury and . . . that it was reasonable and necessary to use deadly force." *Id.* at 584. Counsel then argued how discrete evidence satisfied that standard. He maintained that (1) the call reporting a dispute

8

involving "a man with a gun" at Callahan's home, (2) the officers' observation of a cleaver in plain view in the home, and (3) the officers' failure to receive a response upon announcing their presence in the home objectively supported Officer Wilson's belief of "a real and present threat of danger . . . that there may be a person there that had a gun." *Id.* at 585. Counsel further argued that when Callahan slammed a bedroom door on Officer Wilson, "pinning him with his gun inside that room," the officer "was facing a real fear that the person behind that door could get his weapon and use it against him or, more significantly, was armed himself and was going to shoot [the officer] through that door." *Id.* at 586. Thus, he maintained, the officer confronted "a significant threat of death," *id.* at 594, that put him "in fear of a real threat of death," *id.* at 595. Moreover, in response to the plaintiffs' argument that Officer Wilson's real subjective fear of risk to his life did not equate to objective probable cause to hold such a fear, defense counsel argued that "[a]ny other officer would have faced that same threat and would have had that same reasonable fear." *Id.*

It was for the jury to decide how persuasive counsel were in arguing that the evidence did or did not establish probable cause, but the cited record

convincingly demonstrates that the singular issue in dispute was whether such probable cause existed.[3]

That distinguishes this case from *Rasanen.* There, the jury "did not know, because it was not told," to frame the reasonableness of the officer's actions in terms of probable cause. *Rasanen v. Doe*, 723 F.3d at 336. Here, the jury was so told, both by the court and by counsel. After generally charging the jury that the use of deadly force could be reasonable, the district court cited a single circumstance in which such a conclusion would be warranted: when an officer had probable cause to fear a risk to life or serious physical injury. Meanwhile, counsel for both parties, in summation, told the jury that the determinative issue in the case was whether the officer had probable cause to believe that he was facing a significant threat of death or serious injury. On this record, I identify no charging error. But even if I were to do so, I would find the error harmless beyond a reasonable doubt because I think that on the charge given and the

---

[3] As the Supreme Court has instructed, probable cause is a "flexible, common-sense standard." *Florida v. Harris*, 568 U.S. 237, 240 (2013). While it requires more than "mere suspicion," its focus is on "probabilities," not "hard certainties." *Walczyk v. Rio*, 496 F.3d 139, 156 (2d Cir. 2007) (internal citations and quotation marks omitted). Thus, it does not demand "proof beyond a reasonable doubt or by a preponderance of the evidence," standards that "have no place in a probable cause determination." *Id.* (internal quotation marks and citations omitted); *accord Zalaski v. City of Hartford*, 723 F.3d 382, 393 (2d Cir. 2013).

arguments made, the verdict can only have been based on the jury's finding that, when Officer Wilson shot Callahan, the officer had probable cause to believe that Callahan posed a significant threat of death or serious physical injury to the officer or to others.

Accordingly, I vote to affirm the judgment in favor of defendants.